**Glen HODGES, Plaintiff,**

v.

**PUROLATOR COURIER CORPORATION, Defendant.**

**Civ. A. No. 86–65–2–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

May 20, 1987.

Willie D. Simpkins, III, Howard E. Spiva, P.C., Savannah, Ga., for plaintiff.

George C. Grant, Martin, Snow, Grant & Napier, Macon, Ga., James C. Greble, Joseph P. Paranac, New York City, for defendant.

### ORDER

OWENS, Chief Judge.

Plaintiff Glen Hodges, a black male, has brought action against his employer, defendant Purolator Courier Corporation pursuant to 42 U.S.C. § 1981 to redress alleged discrimination in employment on the basis of race. This matter is presently before the court on cross motions for summary judgment. The following is the court's findings of undisputed fact and conclusions of law.

### Findings of Undisputed Fact

1. The plaintiff has been employed by the defendant since 1980. Since 1981, the plaintiff has been working as a full time "courier guard" assigned to a delivery route. (Plaintiff's Complaint; Affidavit of James Jordan).

2. Defendant Purolator is engaged in the business of providing time-sensitive package delivery services to locations throughout the country. Purolator is administratively organized into several Groups, which encompass specific geographic areas. These Groups are divided into Regions, and the Regions contain Terminals and Sub-Terminals. Each courier guard employed by Purolator is assigned to a courier route or routes based out of a particular Terminal or Sub-Terminal. (Affidavit of James Jordan).

3. Plaintiff was and still is employed as a full time courier guard by Purolator at its Macon, Georgia Sub-Terminal, located in Purolator's Georgia Region. (Affidavit of James Jordan).

4. In 1984, James Jordan served as Purolator's Operations Manager for the Georgia Region. As Regional Operations Manager, his responsibilities included the coordination of courier routes to ensure cost efficient and timely package delivery. (Affidavit of James Jordan).

5. Beginning in early 1984, various economic factors, including rising operational costs and increased competition within the industry, led Purolator to conclude that cost savings measures had to be developed and implemented. In February, 1984, Mr. Jordan was instructed by Mr. Jack Henschel, then Vice President of Purolator's Southeastern Group, to eliminate approximately 200 man-hours in existing courier routes within the Georgia Region. (Affidavit of James Jordan).

6. Subsequently, Mr. Jordan and several other Purolator officials made a detailed

examination of the existing courier routes in the Georgia Region to determine which routes could be consolidated to achieve the necessary man-hours reduction. As a result, Mr. Jordan decided in March, 1984, to make several changes in the route structure. One such change was a decision to consolidate three existing routes in the Georgia Region into two new routes. The existing routes which he determined should be consolidated into two new routes were: (a) the "Macon-Milledgeville" route, which plaintiff had been working out of the Macon Sub-Terminal; (b) the "Atlanta-Thomaston" route, which was then assigned to Mr. Edwin Donaldson and which was based out of the Atlanta Terminal; and (c) the "Atlanta-Milledgeville" route, which was then assigned to Mr. Wayne Hardage and which was also based out of Atlanta. (Affidavit of James Jordan).

7. The two new routes created after the consolidation of the three former routes are: (a) the "Milledgeville-Macon" route, which incorporates certain portions of the former Macon-Milledgeville and Atlanta-Milledgeville routes, and (b) the "Thomaston-Barnesville-Macon" route, which incorporates certain portions of the former Macon-Milledgeville and Atlanta-Thomaston routes. Both new routes are based out of the Macon Sub-Terminal. As a result of the consolidation, Mr. Jordan had to reassign two of the three affected courier guards to the newly-created routes. (Affidavit of James Jordan).

8. Following a consolidation of routes, Purolator was then faced with the question of how to reassign courier guards. Mr. Jordan made his decision based on two principal criteria. First, he determined what was operationally most appropriate and least costly for Purolator. A second and less important criterion was the relative full time company seniority of the courier guards affected by the consolidation. (Affidavit of James Jordan).

9. Due to the nature of the business, most Purolator courier route schedules include a mid-day break of several hours at a specified location. If the mid-day break occurs at a location close to the home of the courier guard working the route, the break is spent at the courier guard's home, and Purolator does not pay him or her during that break. On the other hand, if the mid-day break occurs at a location which is not near the courier guard's home, two options are available. First, the courier guard may, at the beginning of the break, drive the Purolator vehicle to his home, and drive back to the original mid-day break location at the conclusion of the break. This is referred to as "stem time." Under Purolator's stem time policy, Purolator pays the courier guard his or her regular hourly rate for the driving time to and from the courier's home. In addition, Purolator absorbs the operating costs (i.e., gasoline, wear and tear) of the vehicle while it is being driven back and forth. (Affidavit of James Jordan).

10. Under the second option, the courier guard "lays over" or remains at the mid-day break location during the break period. Under the layover policy in effect within Purolator's Southeastern Group in March, 1984, an employee was entitled to collect $6.00 a day in layover pay. In addition, if the mid-day break were over three hours in length, Purolator was obligated to pay for a layover facility, to include lodging, for the courier guard on a daily basis. (Affidavit of James Jordan).

11. Whenever operationally possible, Purolator schedules courier guards to spend their mid-day breaks at home in order to save on stem time, layover costs, and vehicle operating costs. Each of the new routes which were created following the March, 1984, consolidation included a mid-day break as part of their itineraries. (Affidavit of James Jordan).

12. Based on the itineraries of the consolidated routes, as well as the policies described above, Mr. Jordan assigned the newly-created Milledgeville-Macon route to Mr. Hardage and the Thomaston-Barnesville-Macon route to Mr. Donaldson. Both of these men are white. (Affidavit of James Jordan).

13. The new Milledgeville-Macon route consists of (a) a morning package "drop-off" route starting in Macon and ending in

the Milledgeville vicinity; (b) a mid-day break of three to four and one-half hours in Milledgeville; and (c) an afternoon package "pick-up" route beginning in Milledgeville and ending back in Macon. Mr. Hardage lived in Milledgeville. Mr. Hardage was assigned the Milledgeville-Macon route because he could spend his daily mid-day break at his home in Milledgeville and Purolator would not be required to pay him stem time or layover pay, or absorb additional operating costs of the vehicle, or pay for a layover facility. (Affidavit of James Jordan).

14. Plaintiff, who lives in Macon, was not assigned to the new Milledgeville-Macon route because Purolator would have incurred substantial additional costs. If plaintiff had been assigned this route, there were only two options for handling his mid-day break. First, he could have driven the Purolator vehicle back and forth between Milledgeville and his home in Macon, a trip of about 80 miles. Under Purolator's "stem time" practice, Purolator would have been required to pay him his hourly rate for his driving time, at $8.60 an hour, and absorb the operating costs of the vehicle. As a second option, plaintiff could have spent his mid-day break at Milledgeville. Under Purolator's layover policy, Purolator would have paid plaintiff daily layover pay of $6.00, and absorbed the additional cost of a motel room or other layover facility. (Affidavit of James Jordan).

15. The second new route created following the consolidation was the Thomaston-Barnesville-Macon route. This route consists of the following itinerary: (a) a morning "drop-off" route starting in Macon and ending in Thomaston; (b) a several hour mid-day break in Thomaston; and (c) an afternoon "pick-up" route from Thomaston through Barnesville back to Macon. Mr. Donaldson lived in Thomaston. He was assigned the Thomaston-Barnesville-Macon route because he could spend his daily mid-day break at his home, and Purolator would not be required to pay him stem time, layover pay, or absorb vehicle operating or motel room costs. (Affidavit of James Jordan).

16. If, on the other hand, plaintiff had been assigned to the Thomaston-Barnesville-Macon route, Purolator would have had to pay plaintiff for his driving time during the approximately 100–mile Thomaston-Macon round trip and absorb the operating costs of the Purolator vehicle, or pay plaintiff layover pay and pay for a layover facility. In either case, the cost to Purolator would have been substantially higher if plaintiff had been assigned to this route rather than Mr. Donaldson. (Affidavit of James Jordan).

17. Plaintiff's former route, the Macon-Milledgeville route, no longer existed as a result of the consolidation. As a result, in March, 1984, plaintiff was assigned a new route, which, like the Macon-Milledgeville route and the Thomaston-Barnesville-Macon route, had been created from elements of previously-existing routes. Plaintiff's new route was designed to insure that his "drop-off" and "pick-up" routes commenced and terminated in Macon. Thus, plaintiff's mid-day breaks could be spent at his home in Macon, and Purolator would not be required to pay him stem time, layover pay, absorb additional vehicle operations expenses or pay for a layover facility. (Affidavit of James Jordan).

18. Since plaintiff has been assigned the new route, he has worked 40 hours per week, the same number of weekly hours he worked prior to the route reassignment. Plaintiff also continues to receive the maximum rate of pay and benefits Purolator pays to its courier guards. As before the consolidation, plaintiff continues to receive the same rate of pay, benefits, and works the same hours as both Mr. Hardage and Mr. Donaldson. (Affidavit of James Jordan).

19. Within three weeks after the route consolidations, the plaintiff questioned a Mr. Razz Davis at his local terminal on why the reassignments occurred. Mr. Davis told plaintiff that the decision was made in Atlanta and not within the Macon Terminal. Plaintiff did not ask Mr. Davis to investigate the exact reasoning for the decision. (Plaintiff's Deposition, p. 19).

20. In the summer of 1985, the plaintiff complained to Mr. Jordan about his new route. Plaintiff stated that he did not like working the Saturdays and Sundays that his new route sometimes demanded. He also complained that unlike his old route, his new one entailed irregular delivery sites from week to week. He further complained that his old route had been given to a white man. Mr. Jordan assured the plaintiff that he would check into changing his hours so that plaintiff would not have to work weekends. Shortly thereafter, the plaintiff was offered a route that would not entail working weekends. However, plaintiff refused it for the reason that it would still have irregular delivery sites. (Plaintiff's deposition, pp. 26–28).

21. At least two other Purolator full time courier guards have routes that entail irregular delivery sites. Both of these men are white. (Plaintiff's Deposition, p. 28).

22. At no time have any Purolator employees, supervisors, or managers ever made any racial slurs or insults towards the plaintiff. (Plaintiff's Deposition, p. 54).

### Conclusions of Law

■ The defendant contends that plaintiff has failed to establish a prima facie case of race discrimination in employment. To support a prima facie case of discriminatory transfer, the plaintiff must establish:

(1) that he belongs to a racial minority;

(2) that he was qualified for the job from which he was transferred;

(3) that despite his qualifications he was transferred; and

(4) that his former job was filled by someone with the same qualifications.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824 & n. 13, 36 L.Ed.2d 668 (1973); *Maddox v. Claytor,* 764 F.2d 1539, 1546 (11th Cir.1985).

■ Defendant asserts that since plaintiff's old route was abolished, he was not "replaced" by someone else. This court disagrees. It is true that the entirety of plaintiff's former route was not given to a *single* courier guard. However, it is this court's opinion that this is not a requirement for plaintiff to meet his prima facie case. Plaintiff's former Macon-Milledgeville route was split between Donaldson and Hardage. Whether one or two persons replaced the plaintiff is of no relevance. To hold otherwise would provide discriminatory employers with an effective means to defeat any employee's prima facie case. The plaintiff, based on the outlined undisputed facts, has met the burden of supporting a prima facie case of discrimination.

■ This, however, does not end the analysis. If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant employer to "articulate some legitimate, non-discriminatory reason" for the alleged discriminatory treatment. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The defendant's burden is a light one. The defendant's burden is one of production and not proof. *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982). "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons ... it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. The affidavit submitted by the defendant's Operations Manager for the Georgia Region, Mr. Jordan, and factually set out by the court above, clearly meets this burden of production.

■ Once the employer has met its burden of production, the plaintiff must then show by a preponderance of the evidence that the defendant's explanation is merely pretext. 411 U.S. at 804, 93 S.Ct. at 1825. The defendant contends that plaintiff has produced *no* evidence that its "proffered explanation [for the transfer] is unworthy of credence." 450 U.S. at 256, 101 S.Ct. at 1095. Therefore, defendant asserts, since no question of fact exists on this issue, judgment on its behalf is mandated.

In evaluating the propriety of granting summary judgment at the pretext stage the court is aware that such is not ordinari-

ly appropriate when intent and state of mind are implicated. *Accord Hatcher v. Board of Educ.*, 809 F.2d 1546, 1558 (11th Cir.1987). However, this case is completely devoid of any evidence,[1] direct or indirect, that could possibly be relevant to the question of whether the decision to transfer plaintiff was racially motivated.

▪ Plaintiff contends that he was not told the reason for his transfer until a year afterwards. This, he asserts, is at least some evidence of discriminatory motive. However, plaintiff's deposition testimony does not bear this out. The plaintiff questioned an individual who was not involved in the consolidation decision. When told that the decision was made in Atlanta, the plaintiff chose to not "push it." This questioning took place within three weeks of the consolidation. It was not until the next year that plaintiff decided to question the decision further. It is clear to this court that the reason the plaintiff was not told the exact details of the reasoning behind the consolidation was due to his voluntary decision to not pursue the matter after only a single brief investigation. These facts do not provide a possible inference of pretext.

The court is further convinced by the Supreme Court's recent opinion of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that summary judgment is appropriate in this case. There, the Court stated:

[o]ur prior decisions may not have uniformly recited the same language in describing genuine factual issues under Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.

*Id.* 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 (citations omitted). The Court then went on to further state:

"[n]or are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

*Id.* 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 20 L.Ed. 867 (1872)) (citations omitted) (emphasis in original). The Court squarely held that this standard applies to *summary judgment motions* as well as a motion for directed verdict. *See id.* 477 U.S. at ——, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

As stated earlier, it is the *plaintiff* who has the burden at trial to prove by a preponderance of the evidence that defendant's route assignment decision was racially motivated, in spite of the legitimate nondiscriminatory reasons articulated by defendant. *See McDonnell*, 411 U.S. at 804, 93 S.Ct. at 1825. This court is of the opinion, based on these facts, that no jury could properly proceed to find favorably for the plaintiff on the issue of pretext.

---

1. The plain language of Rule 56(c), Fed.R.Civ.P. mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish the existence of an element *essential* to that party's case and on which that party will bear the burden of proof at trial. There is no requirement that the defendant, in the case at bar, *negate* the elements of plaintiff's claim. *See Celotex Corp. v. Catrett*, 91 L.Ed.2d 265 (1986).

Accordingly, defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. Judgment will be entered for the defendant.